UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**CLAYTON GEORGE SMITH,**

        **Petitioner,**

**v.**

                                                 **Civil Action No. 2:19-cv-72**

**HAROLD W. CLARKE, Director,**
**Virginia Department of Corrections**

        **Respondent.**

**REPORT AND RECOMMENDATION**

Petitioner Clayton George Smith is currently serving a ninety-three-year sentence at the Virginia Department of Corrections following October 2013 convictions of armed common law burglary, robbery, aggravated malicious wounding, use of a firearm in the commission of a felony, and conspiracy. Smith also pled guilty to driving with a suspended license (third or subsequent offense), for which he received a jail sentence of ninety days. Having exhausted all state remedies, Smith, with the assistance of counsel, now petitions for a writ of habeas corpus under 28 U.S.C. § 2254, (ECF No. 1). In his Petition, Smith argues (1) that he received ineffective assistance of counsel in that his trial counsel failed to properly object to the admission of a prior conviction; and (2) that the state court improperly admitted incriminating statements Smith made to law enforcement allegedly in violation of Miranda v. Arizona, 384 U.S. 436 (1966). Respondent Harold W. Clarke, Director of the Virginia Department of Corrections, (Respondent) moves to dismiss the petition, (ECF No. 8), arguing § 2254(d) precludes habeas relief.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the assigned district judge referred the motion to the undersigned for a report and recommendation.

As explained in greater detail below, the undersigned concludes that Smith does not plausibly allege entitlement to relief under § 2254 and thus recommends that the court grant Respondent's Motion to Dismiss Smith's Petition.

## I. <u>Statement of the Case</u>

On October 24, 2013, a Stafford County Circuit Court jury convicted Smith of one count of armed common law burglary, two counts of aggravated malicious wounding, two counts of robbery, two counts of use of a firearm in the commission of a felony, and one count of conspiracy (the "jury convictions"). (J.A. at 18.)[1] In addition, just before the trial began, the court accepted Smith's guilty plea to a pending misdemeanor charge of driving with a suspended license (third or subsequent offense). (J.A. at 17-18, 85-88.) The misdemeanor driving offense occurred on the same day as the events underlying Smith's other charges, January 29, 2013. (J.A. at 18.) Smith attempted to withdraw the guilty plea several moments later, but the circuit court denied his motion, finding that Smith "made that plea freely, voluntarily and intelligently with the advice of counsel." (J.A. at 108-12.)

At trial, Smith's brother testified that during the time of the offenses, Smith had been with him in Dumfries, Virginia, which is located in Prince William County. (J.A. at 13, 367-370.) As a result, the Commonwealth asked about his knowledge of the misdemeanor driving conviction to impeach his alibi testimony. (J.A. at 370-72.) When the Commonwealth first inquired about Smith's driving-with-a-suspended-license conviction, Smith's attorney immediately objected, but the court summarily overruled the objection. (J.A. at 370.) Smith's brother testified that he had

---

[1] All Joint Appendix citations in this report relate to <u>Smith v. Commonwealth</u>, No. 0427-14-4 (Va. Ct. App.).

2

no knowledge of that conviction. (J.A. at 370.) The Commonwealth continued to press the issue, prompting Smith's attorney to interject: "Objection, Judge. There's no connection between any date or time – there's no connection between any time." (J.A. at 371.) The court sustained this objection on the grounds that the witness had already answered the Commonwealth's question. (J.A. at 371.)

Later during the trial, the court admitted evidence of that conviction, also over Smith's counsel's objection. (J.A. at 382-84.) This time, Smith's counsel stated, "Judge, again, I would object insofar as, as I raised the objections earlier on in the testimony about the timing and so on." (J.A. at 383-84.)

Smith received a sentence of ninety-three years in prison for the jury convictions and a sentence of ninety days in jail for the misdemeanor driving conviction. (J.A. at 19.) The circuit court entered final judgment on February 27, 2014. (J.A. at 18-20.) Smith appealed his convictions to the Virginia Court of Appeals, advancing two arguments. First, Smith argued that the circuit court erred in admitting statements made by Smith that he claimed law enforcement obtained in violation of Miranda. Appellant Opening Br. 7, No. 0427-11-4 (Apr. 27, 2015). Second, Smith argued that the circuit court erred in denying Smith's motion to withdraw his guilty plea to the driving charge. Id.

A three-judge panel of the court of appeals agreed that the circuit court abused its discretion in refusing to allow Smith to withdraw his guilty plea to the misdemeanor driving charge and remanded the matter to the circuit court for further proceedings. Smith v. Commonwealth, 777 S.E.2d 235, 242-43 (Va. Ct. App. 2015). However, it rejected Smith's Miranda claim and affirmed both the trial court's decision to admit the disputed statements and the related the jury convictions.

3

Id. at 204-41. In doing so, the Court of Appeals summarized the relevant evidence on the Miranda issue as follows:

> On January 29, 2013, Shemeka Williams ("Williams") was in her apartment in Stafford County with her boyfriend Warren Jackson ("Jackson") and Jeffrey Hylton ("Hylton") when three armed men kicked in the front door to the apartment at approximately 10:40 p.m. Jackson was robbed of $350 to $400 from his pocket. Hylton was robbed of $500. The intruders shot Jackson twice in the buttocks and twice in the leg. They also shot Hylton four times in the leg and once in the groin before fleeing the scene. After the intruders left the apartment, Williams called 911 at 10:54 p.m.
>
> Detective Michelle Gibbons ("Detective Gibbons") of the Stafford County Sheriff's Office recovered a surveillance tape of an adjacent office building which showed a black Nissan parked outside of Williams's residence at the time of the incident. At 10:42 p.m., three men got out of the car, which was left running, and ran back toward the car several minutes later. Detective Gibbons traced the license plate and determined the car was registered to Smith's wife and mother-in-law. The car's registration address was Smith's residence. Because investigators believed that the car shown in the surveillance footage had been involved in the home invasion, they kept surveillance on Smith's house "waiting for the vehicle to kind of come and go."
>
> On January 30, 2013, after Smith was seen driving the vehicle, police stopped him in Prince William County. Smith was detained, handcuffed, and placed in the back of an unmarked vehicle. Detective Gibbons arrived on the scene shortly thereafter and sat in the back of the vehicle with Smith because it was "downpouring" and both Smith and Detective Gibbons were "drenched and soaking wet." Detective Gibbons told Smith he was "being detained," explained who she was and that she was conducting an investigation of an incident "that occurred the night prior in Stafford Country." Detective Gibbons "didn't know if [Smith] was going to talk with [her] or not or what his position was going to be, so [she] just asked [Smith] at that point if he would be willing to talk to [her]."
>
> At the suppression hearing, Detective Gibbons described her interaction with Smith:
>
>> At that point, he asked me what I wanted to talk to him about. I said, well, I want to talk to you about the whereabouts, you know, of you and your vehicle from the night prior. At that point, he then just stated to me that he had the vehicle and that the vehicle belonged to his wife and he had it from about 8:00 p.m. to 2:30 a.m. He told me at that point that he was with a girl and asked me not [to] tell his wife. At that point, I said, well, would you be willing to go to the Garfield Station, again, due to where we are and, you know, the

4

> circumstances of where we're sitting and everything, to talk to—more about this with me. At that time he says, well, I don't really have any more information for you and said, I don't want to talk to you.

At that point, Detective Gibbons did not ask Smith any additional questions and their conversation ended.

In response to a question by the judge at the suppression hearing, Detective Gibbons reiterated:

> I said, hey, you know, we're both soaked, we're drenched, we're sitting in the back of a car, this isn't the ideal kind of setting, and again, I said would you be willing to [go to] the Garfield Station. He said, well, what is it that you want to—what would you be asking me. And I said, well, I just want to ask you questions in regards to your whereabouts, where the vehicle was, and that sort of thing, and then he just started saying that, you know, he had the vehicle from 8:00 p.m. to 2:00 a.m., it was his wife's vehicle.

Detective Gibbons offered little information to Smith about the case she was investigating and did not ask Smith "any specific questions." Detective Gibbons did not inform Smith of his Miranda rights during their encounter.

At the suppression hearing, Smith testified that he was a twice-convicted felon and initially did not dispute Detective Gibbons's testimony regarding their interaction once she got in the police car. However, Smith later stated that Detective Gibbons had asked him where the vehicle was on the night before, to which he replied that he "had the vehicle from a certain time until the (inaudible) time. I came home." The trial court denied Smith's motion, holding:

> The format of the statements the officer made do not seem to be overtly designed to draw a response, but merely to acquaint the defendant with the subject of what might be a future interrogation. The only question that was asked was one of logistics. Would you go to a particular station with me, that is not designed to draw out any incriminating testimony, it's simply designed to draw an opinion as to where such an encounter should take place.

Id. at 237-39. Given the evidence, the court of appeals agreed with the circuit court's characterization of the nature of the interaction between Detective Gibbons and Smith:

> The record is clear that Detective Gibbons did not initiate any line of questioning relating to her investigation of the home invasion. Instead, her only question was simply one of logistics to determine whether Smith would be willing to talk with

5

> her at a future time and location, given the fact that they were both wet from the rain and in the back of a police car seeking temporary shelter from the weather. . . . The challenged statement by Detective Gibbons was made solely in response to Smith's question regarding his possible transportation to the police station. Similar to [Commonwealth v. Quarles, 720 S.E.2d 84 (Va. 2012)], which held that the mere mention of certain evidence that was suggestive of guilt is not an interrogation, the fact that Detective Gibbons told Smith that she may ask him about his whereabouts and the whereabouts of his wife's vehicle if he agreed to talk to her did not rise to the level of interrogation to trigger Smith's Miranda rights. . . . Smith was simply asked if he would agree to speak with Detective Gibbons at a future time. Detective Gibbons's question could not be reasonably taken in context as designed to elicit any incriminating response; it was designed to determine if a future interrogation may take place at the police station. The record reflects that Smith volunteered his incriminating statement after Detective Gibbons answered his question regarding her reasons for asking him to accompany her to the police station. Detective Gibbons could not anticipate that Smith would volunteer the fact that he had been in possession of his wife's vehicle the night before. Considering the totality of the evidence in the record, we find no merit in Smith's contention that his statements to Detective Gibbons were the result of an interrogation.

Id. at 240-41. Smith petitioned the Virginia Supreme Court for review, but it refused Smith's appeal. Smith v. Commonwealth, No. 151865 (Va. July 27, 2016).

In February 2017, Smith filed a habeas petition in the Stafford County Circuit Court, alleging, among other things,[2] the two claims he asserts here. The circuit court dismissed the petition in full. Smith v. Clarke, No. CL17-187 (Va. Cir. Ct. Oct. 5, 2017). In dismissing the Miranda claim, the court stated that it was bound by the court of appeals' holding that Smith was not subjected to custodial interrogation. Id. at 2. With respect to the ineffective assistance claim, the court held that Smith failed both prongs of the applicable test announced in Strickland v. Washington, 466 U.S. 688 (1984). Id. at 1-2, 4. The court found that Smith's trial counsel's

---

[2] Smith also alleged several other claims in his state habeas petition, but the circuit court held that those claims were procedurally defaulted for failure to raise those claims on direct appeal, and he does not assert those claims here.

6

performance was not constitutionally deficient because counsel objected to the admission of Smith's driving with suspended license conviction.[3] Id. at 2, 4. The court further noted that, in any event, "the evidence of [Smith's] guilt on the felonies was so strong that any claimed ineffectiveness by trial counsel regarding the misdemeanor driving charge did not prejudice [Smith] within the meaning of Strickland."[4] Id. at 2, 4. Smith sought review by the Virginia Supreme Court, but it again refused Smith's appeal. Smith v. Clarke, No. 171471 (Va. Oct. 16, 2018). This Petition followed on February 13, 2019.

In his present Petition, Smith raises two arguments. First, he argues that his trial counsel rendered ineffective assistance of counsel by failing to "object with specificity to the Commonwealth's introduction of [Smith's] driving on a suspended license conviction order as inadmissible prior 'bad acts' evidence." Pet. 6 (ECF No. 1, at 5). Had trial counsel properly objected, Smith contends, the conviction would not have been admitted, and thus "there is a substantial likelihood that the jury would have found petitioner not guilty, as there was little or no other evidence placing [Smith] at the scene of the crime." Id. Second, Smith argues that he was denied his Fifth Amendment right against self-incrimination because he was subjected to custodial interrogation without being made aware of his Miranda rights, and the statements made during the unlawful interrogation were used against him at trial. Pet. 8 (ECF No. 1, at 7). Smith elaborates in his opposition brief to Respondent's Motion to Dismiss that had the incriminating statements not been introduced during his trial, "there would have been little or no evidence placing [Smith]

---

[3] The court also based this conclusion on Smith's trial counsel's sworn testimony in a post-trial affidavit that he advised Smith that he believed that Smith's conviction would be inadmissible because it constituted a "prior bad act." Id. at 2, 4; Resp't's Br. Supp. Mot. to Dismiss (Resp't's Br.), Ex. 1 (ECF No. 10-1, at 3).

[4] The court, however, did not discuss the substance of such evidence.

7

at the scene of the crime on the night in question." Pet'r's Br. Opp. to Mot. to Dismiss (Pet'r's Opp. Br.) 7 (ECF No. 12). Respondent argues that the court should dismiss Smith's Petition because the circuit court's denial of his state habeas petition as to each of his alleged grounds was "reasonable" under 28 U.S.C. § 2254(d). Resp't's Br. 4. The matter is now ripe for decision.

## II. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, a state prisoner may petition a federal court for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). However, a federal court may not grant habeas relief for claims previously adjudicated on the merits in state court unless that adjudication was (1) contrary to, or an unreasonable application of, clearly established federal law;[5] or (2) based on an unreasonable determination of the facts given the evidence. § 2254(d).[6] In circumscribing federal courts' jurisdiction in this respect, Congress "plainly sought to ensure a level of deference to the determinations of state courts." Williams, 529 U.S. at 386 (internal quotation marks and citation omitted). Consequently, in determining whether to issue a writ in such circumstances, the question "is not whether a federal

---

[5] A state court decision is "contrary to" clearly established federal law when the state court (1) applies a rule "that contradicts the governing law set forth" by controlling Supreme Court precedent, Williams v. Taylor, 529 U.S. 362, 405 (2000); or (2) is confronted with a set of facts "materially indistinguishable" from a Supreme Court decision but decides the case differently, id. at 406. A state court decision reflects an "unreasonable application of" clearly established federal law when the state court "correctly identifies the governing legal principle but applies it unreasonably to the facts of the particular prisoner's case." Id. at 407-08.

[6] In addition, state prisoners "must exhaust their state remedies before filing a habeas petition in federal court." Robinson v. Thomas, 855 F.3d 278, 283 (4th Cir. 2017). This requirement "giv[es] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Jones v. Sussex I State Prison, 591 F.3d 707, 712 (4th Cir. 2010). In this case, Respondent concedes that, with respect to the two claims raised in the Petition, Smith has exhausted all state remedies. Resp't's Br. 3.

court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see also Harrington v. Richter, 562 U.S. 86, 103 (2011) ("[T]he state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

In assessing a state prisoner's habeas claims, the court must look to "the last reasoned decision of a state court addressing the claim." Woodfolk v. Maynard, 857 F.3d 531, 544 (4th Cir. 2017) (internal quotation marks and citation omitted). Moreover, any factual findings made by the state court are presumptively correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

### III. Recommended Conclusions of Law

#### A. Ineffective Assistance of Counsel Claim

Smith first argues that he received ineffective assistance of counsel in violation of the Sixth Amendment. See Strickland, 466 U.S. at 686 ("[T]he [Sixth Amendment] right to counsel is the right to the effective assistance of counsel." (emphasis added)). In reviewing an ineffective-assistance-of-counsel claim, the relevant inquiry is whether the petitioner's attorney's "unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986). In order for a petitioner to succeed on an ineffective assistance claim, therefore, he must satisfy both the "performance" and the "prejudice" prongs of the two-part test set forth in

Strickland, 466 U.S. at 687.[7] To satisfy the "performance" prong, the petitioner must demonstrate that his "counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. In evaluating this prong, a court must keep in mind that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. To satisfy the "prejudice" prong, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[8] Id. at 694. "Although Strickland is a two-prong test, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016) (citing Strickland, 466 U.S. at 697).

In addition to the presumption of reasonableness accorded to counsel's decisions, because Smith brings this Petition under 28 U.S.C. § 2254 and a state court has previously adjudicated Smith's claims on the merits, review in this court is "doubly deferential." Burt v. Titlow, 571 U.S. 12, 15 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)); see, e.g., Burr v. Lassiter, 513 F. App'x 327, 340 (4th Cir. 2013) ("[W]here the issue is whether the state court has unreasonably applied Strickland standards to an ineffective assistance of counsel claim, 'double

---

[7] As both prongs of the test are "separate and distinct elements" of an ineffective assistance claim, Smith must satisfy both requirements of the test to prevail on the merits. Spencer v. Murray, 18 F.3d 229, 232-33 (4th Cir. 1994); see also Strickland, 466 U.S. at 697.

[8] A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

10

deference' is required – deference to the state court judgment granting deference to trial counsel's performance.").

Based on the record in this case, a state court could reasonably conclude that Smith failed to establish ineffective assistance of counsel with respect to the introduction of Smith's driving-with-a-suspended-license conviction. First, the trial transcript reflects that, with respect to that conviction, trial counsel objected on three separate occasions – twice when the Commonwealth disclosed it to Smith's brother on cross-examination, (J.A. at 370-71), and again when the Commonwealth moved to introduce the conviction into evidence, (J.A. at 382-384). In objecting, Smith's trial counsel disputed the conviction's "connection" to the trial. (J.A. at 371, 383-84.) And though the trial transcript does not detail the precise evidence rule or rules underpinning the objections, given the context and discussion surrounding that conviction as reflected in the record, the transcript is sufficiently clear as to make reasonable the circuit court's determination that trial counsel's performance in this regard did not "f[a]ll below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Moreover, Smith's present contention that counsel should have objected on the grounds that the prior misdemeanor conviction was inadmissible evidence of a prior bad act is not persuasive. The conviction was not offered to show Smith's character but to demonstrate his presence in Stafford County on the night of January 29, 2013, and thus his opportunity to commit the other offenses. See Va. R. Evid. 2:404(b).

Furthermore, the circuit court's finding that, regardless of counsel's performance, Smith could not demonstrate prejudice is also a reasonable conclusion. In denying Smith's petition on this point, the court stated that "the evidence of [Smith's] guilt on the felonies was so strong that any claimed ineffectiveness by trial counsel regarding the misdemeanor driving charge did not prejudice [Smith] within the meaning of Strickland." Smith, No. CL17-187, at 2, 4. Although the

11

circuit court did not identify what this other evidence consisted of, an independent review of the record demonstrates that the circuit court's finding on the <u>Strickland</u> prejudice prong was reasonable.

Smith claims that the misdemeanor driving conviction was the only evidence connecting him to the crimes committed in Shemeka Williams' apartment on January 29, 2013. But on the same date, exterior surveillance cameras on the office building immediately adjacent to Shemeka Williams' apartment captured footage of three men exiting a vehicle moments before the home invasion and at least three men running toward and entering the same vehicle moments after the reported crime. (J.A. at 236-40.) The same footage also recorded the license plate number of the vehicle. (J.A. at 238, 240-41.) Law enforcement ran a search of the license plate and discovered that the vehicle – a Nissan Maxima – was registered to Smith's wife and mother-in-law. (J.A. at 241.) In addition, the vehicle's registered address was Smith's place of residence. (J.A. at 241.)

The day after the incident, January 30, law enforcement surveilled Smith's residence and observed Smith driving the same vehicle. (J.A. at 242-243.) Police thereafter conducted a traffic stop of the Nissan. (J.A. at 243.) During the stop, Smith told Detective Gibbons that he was in possession of the Nissan the night before, between 8:00 P.M. and 2:00 A.M, "with a girl that wasn't his wife."[9] (J.A. at 244.) The crime occurred within that timeframe. (J.A. at 133-34, 227.)

Police executed a search warrant of Smith's residence the same day. (J.A. at 241.) During the search, police discovered a gym bag in a bedroom closet. (J.A. at 266-67.) The bag contained

---

[9] At an October 18, 2013 suppression hearing, Detective Gibbons testified that law enforcement first detained Smith by cuffing him and placing him in the back of an unmarked police vehicle before Smith offered this statement. (J.A. at 30-32.) However, as explained below, a state court could reasonably conclude that law enforcement's obtaining these statements did not violate <u>Miranda</u>.

"multiple documents and resumes with [Smith's] name on them." (J.A. at 267.) The bag also contained "multiple cartridges of [unfired] ammunition" and a "magazine for a Glock brand semiautomatic firearm." (J.A. at 268.) The ammunition casings included a "Winchester forty-five" head stamp, which matched the head stamp of one spent ammunition casing found at the scene of the crime. (J.A. at 269-70.)

Police also obtained a warrant to search Smith's cell phone and as well as a court order to acquire the phone's records. (J.A. at 244-45.) With this information, law enforcement identified four other suspects, including Keith Williams. (J.A. at 245-46.) Police obtained Keith Williams' phone records and later arrested him on February 6, 2013. (J.A. at 247-48.) At the time of his arrest, Keith Williams was in possession of a Hi-Point forty-five caliber semiautomatic pistol. (J.A. at 248-49.) The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) examined the Hi-Point pistol and determined that it was in good-working condition. (J.A. at 251.) In addition, ATF analysis revealed that two spent ammunition casings recovered from the scene of the crime "microscopically match[ed] up to being fired from" the same Hi-Point pistol. (J.A. at 253.)

Lastly, using Smith's cell phone records, law enforcement was able to project the location of Smith's cell phone during the time of the crime. Federal Bureau of Investigation Special Agent Luis DeJesus testified that at the time of the home invasion, Smith's cell phone was connected to a cell tower with a projected coverage area encompassing Shemeka Williams' apartment for a period of fourteen minutes before ultimately connecting to a cell tower near Smith's residence in Prince William County later that evening. (J.A. at 241-42, 276-88.)

Contrary to Smith's contention, the above demonstrates that even without the introduction of the misdemeanor driving conviction, there was overwhelming evidence indicating Smith's involvement in the offenses for which he was convicted such that the circuit court could reasonably

13

conclude that Smith could not establish prejudice under Strickland. Accordingly, the undersigned finds that Smith has not overcome the double deference owed to the circuit court's decision, and therefore this court should deny his claim for relief under § 2254 with regard to his ineffective assistance of counsel claim.

**B.     Miranda Violation Claim**

Smith also claims a violation of his Fifth Amendment right against self-incrimination. Specifically, he alleges that the state court erroneously permitted the admission of incriminating statements that law enforcement obtained without first advising Smith of his Miranda rights. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Because "the inherently coercive nature of custodial interrogation 'blurs the line between voluntary and involuntary statements,'" J.D.B. v. North Carolina, 564 U.S. 261, 269 (2011) (quoting Dickerson v. United States, 530 U.S. 428, 435 (2000)), the Court prescribed "a set of prophylactic measures" that law enforcement must take before and during the questioning of a suspect in custody, id. Specifically, law enforcement must warn the suspect that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479. In addition, law enforcement must respect the suspect's invocation of any of these rights at any time during the interrogation. Id. "When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." Oregon v. Elstad, 470 U.S. 298, 317 (1985). However, Miranda applies only to "custodial interrogation." 384 U.S. at 444. Hence, the suspect must be in "custody or otherwise

deprived of his freedom of action in any significant way," and the suspect must be "subjected to interrogation." Id. at 444, 467. One without the other does not trigger the protections of Miranda. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). In this case, Respondent does not dispute whether Smith was in custody. Thus, the question is whether Smith was "interrogated."

For purposes of Miranda, "interrogation" includes not only express questioning but also its "functional equivalent," including "any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." Id. at 300-01. But "when the police have no reason to expect that a question will lead a suspect to incriminate himself, that question cannot constitute an interrogation under Miranda. United States v. Johnson, 734 F.3d 270, 277 (4th Cir. 2013); see also Innis, 446 U.S. at 301-02 ("[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions."). Accordingly, in Innis, the Supreme Court held that a conversation between two police officers in the presence of an arrested suspect did not constitute an interrogation, even though it prompted a confession. 446 U.S. at 302-03. The Court noted that the police did not directly question the suspect and could not have known that their conversation, "to which no response from the respondent was invited," was reasonably likely to provoke an incriminating response. Id. at 302-03. Likewise, in United States v. Payne, the Fourth Circuit found that police did not conduct an interrogation when an officer informed an arrested suspect that police discovered a gun at his home, to which the suspect responded, "I just had it for my protection." 954 F.2d 199, 201-03. The officer's statement did not "s[eek] or require[] a response," id. at 203, and did not otherwise amount to a "compelling influence[]" or "psychological ploy[]," id. (quoting Arizona v. Mauro, 481 U.S. 520, 529 (1987)). Rather, the suspect volunteered the incriminating statement, see id., and "[v]olunteered statements of any kind are not barred by the Fifth Amendment," Miranda, 384 U.S. at 478.

15

Prior to trial, Smith sought to exclude his statements – that he was in possession of the Nissan on the night of the home invasion – to Detective Gibbons while handcuffed in the back of an unmarked police vehicle as a violation of <u>Miranda</u> because Detective Gibbons did not read him his <u>Miranda</u> rights. On October 18, 2013, the circuit court held a suppression hearing, during which Detective Gibbons and Smith testified. (J.A. at 21-73.) Detective Gibbons testified that law enforcement conducted a traffic stop of Smith and then detained him by cuffing him and placing him in the back of a police cruiser. (J.A. at 30.) Detective Gibbons then joined Smith in the back of the cruiser and asked Smith whether he would be willing to go to the police station to answer some questions involving Detective Gibbons' investigation of an incident that occurred in Stafford County the night before. (J.A. at 30-31.) Because it was raining heavily and both her and Smith were "soaked," Detective Gibbons thought the police station would be a more ideal setting for conversing. (J.A. at 33.) Smith asked what kind of questions Detective Gibbons planned to ask him. (J.A. at 31.) Detective Gibbons responded, "[W]ell, I want to talk to you about the whereabouts, you know, of you and your vehicle from the night prior."[10] (J.A. at 31.) Detective Gibbons testified that Smith then told her that "the vehicle belonged to his wife and he had [the vehicle] from about 8:00 p.m. to 2:30 a.m." while he was with another woman. (J.A. at 31-32.) Detective Gibbons asked again whether Smith would be willing to go to the police station to answer some questions, but Smith responded that he had no more information to provide and did not wish to speak with her anymore. (J.A. at 32.) At that point, Detective Gibbons ceased further communication with Smith. (J.A. at 32.) Detective Gibbons confirmed that she never read Smith

---

[10] When pressed on cross-examination about how much information regarding the investigation Detective Gibbons divulged to Smith, she testified, "I didn't give a whole lot of information. Just said would you be willing to go, it's in regards to an incident I'm investigating in Stafford County." (J.A. at 34-35.)

16

his <u>Miranda</u> rights, but she also testified that she never directly questioned Smith about the home invasion other than whether he would be willing to accompany her to the police station for questioning. (J.A. at 30-38, 43-45.)

Smith briefly testified at the suppression hearing as well. Although he testified on cross-examination by the Commonwealth that he did not dispute Detective Gibbons' recollection of their conversation, (J.A. at 53), he later testified on redirect that he disagreed with Detective Gibbons' characterization of their interaction and testified that Detective Gibbons directly asked him where the Nissan was the night of the incident. (J.A. at 53-55.)

Resolving all credibility disputes in favor of Detective Gibbons, the circuit court denied Smith's motion to suppress, reasoning that, although Smith was in custody, Smith was not interrogated within the meaning of <u>Miranda</u> and its progeny. (J.A. at 67-69.) According to the circuit judge, the only question Detective Gibbons asked Smith was whether he would go to the station to answer some questions about an incident she was investigating. (J.A. at 68-69.) In addition, the judge concluded that the detective's statements as to what she planned to ask Smith should he accompany her to the station were "not designed to draw out any incriminating testimony." (J.A. at 68.)

On appeal, the Virginia Court of Appeals affirmed the circuit court's judgment, holding that:

> The challenged statement by Detective Gibbons was made solely in response to Smith's question regarding his possible transportation to the police station. . . . Smith was simply asked if he would agree to speak with Detective Gibbons at a future time. Detective Gibbons's question could not be reasonably taken in context as designed to elicit any incriminating response; it was designed to determine if a future interrogation may take place at the police station. The record reflects that Smith volunteered his incriminating statement after Detective Gibbons answered his question regarding her reasons for asking him to accompany her to the police station. Detective Gibbons could not anticipate that Smith would

17

>   volunteer the fact that he had been in possession of his wife's vehicle the night before.

Smith, 777 S.E.2d at 241. In his state habeas petition, Smith raised the same Miranda violation claim. However, the circuit court, relying on the court of appeals' decision as binding authority, dismissed the claim. Smith, No. CL17-187, at 2.

As with the ineffective assistance claim, the undersigned likewise finds that a state court could reasonably conclude that Detective Gibbons did not violate Smith's Miranda rights and thus that his statements regarding his possession of the Nissan on the night of the home invasion was admissible. As noted previously, the state court's factual findings are "presumptively" correct absent clear and convincing evidence rebutting those findings. 28 U.S.C. § 2254(e)(1). Here, the state habeas court relied on the factual findings made by the circuit court during the suppression hearing (and the upholding of those findings by the court of appeals). See Smith, No. CL17-187, at 2. Smith has no made showing, and nothing in the transcript of the suppression hearing suggests, that the circuit court's factual findings at that suppression hearing should not be entitled to a presumption of correctness. Furthermore, the test is not whether the state court's decision is incorrect; the test is whether the state court's decision is objectively unreasonable. Schriro, 550 U.S. at 473. Accordingly, it will not do to merely argue that some court could reasonably find that the interaction between Smith and Detective Gibbons implicated Miranda. Rather, Smith must demonstrate that no state court could reasonably find that Detective Gibbons did not violate Miranda. See Harrington, 562 U.S. at 103 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of that decision." (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004))).

After reviewing the entire record underlying the court of appeals' ruling on Smith's Miranda claim, the undersigned concludes that its decision was reasonable. Indeed, the court of

appeals provided a thorough analysis and well-reasoned determination that Detective Gibbons did not interrogate Smith within the meaning of Miranda. According to Detective Gibbon's credited testimony, she merely asked Smith if he would accompany her to the station to answer some questions about an incident that occurred the night before. (J.A. at 30-38, 43-45.) In fact, she testified that she did not ask him any specific, direct questions about the ongoing investigation precisely because she had not yet Mirandized Smith. (J.A. at 35.) Only when asked by Smith what those questions would consist of did Detective Gibbons reveal their nature. (J.A. at 31-37.) The incriminating statements Smith complains of were made in response to Detective Gibbons' explanation, and without any further questioning by her. Given this interaction, the factual accuracy of which is presumed, a state court could reasonably conclude that in disclosing the nature of the questions she planned to ask, Detective Gibbons did not interrogate Smith. She neither directly "invited" a response, Innis, 446 U.S. at 302, nor should have known that her statements were "reasonably likely to elicit an incriminating response," id. Absent the presence of an interrogation, Miranda did not forbid the admission of Smith's statements to Detective Gibbons that he was in possession of the Nissan on the night the of the reported crimes.

## IV. Conclusion and Recommendation

For the foregoing reasons, the undersigned concludes that Smith has not overcome the highly deferential standard of review under 28 U.S.C. § 2254(d) and thus is not entitled to federal habeas relief. Accordingly, the undersigned recommends that the court GRANT Respondent's Motion, (ECF No. 8), and DISMISS with prejudice Smith's Petition, (ECF No. 1).

## V. Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of service of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6 (a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an additional three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 14, 2019